UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN C.,[1] | ) | CIVIL ACTION NO. 4:22-CV-2031 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| MARTIN O'MALLEY, | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff John C., is an adult who lives in the Middle District of Pennsylvania.
He seeks judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying his application for disability insurance benefits under
Title II of the Social Security Act. Jurisdiction is conferred on this Court pursuant to
42 U.S.C. §405(g).

This matter is before us upon consent of the parties pursuant to 28 U.S.C.
§ 636(c) and Rule 73 of the Federal Rules of Civil Procedure. After reviewing the
parties' briefs, the Commissioner's final decision, and the relevant portions of the
certified administrative transcript, we find the Commissioner's final decision is not

---

[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States recommends that federal courts refer to
Social Security Plaintiffs by their first name and last initial to protect their privacy.
We adopt this recommendation.

supported by substantial evidence. Accordingly, we will grant Plaintiff's request for further administrative review of his application for benefits and will remand this matter to the Commissioner for further proceedings.

## II.   BACKGROUND AND PROCEDURAL HISTORY

On April 20, 2021, Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act. (Admin. Tr. 11; Doc. 7-2 p. 12).  In this application, Plaintiff alleged he became disabled on January 1, 2018, when he was thirty-two years old, due to the following conditions: traumatic brain injury, post-traumatic stress disorder, migraines, vertigo, sleep apnea, cervical radiculopathy, and lumbar spine impairment. (Admin. Tr. 270; Doc. 7-6, p. 9). Plaintiff alleges that the combination of these conditions affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, complete tasks, concentrate, understand, follow instructions, use his hands, get along with others, and his memory. (Admin. Tr. 291; Doc. 7-6, p. 30). Plaintiff graduated high school. (Admin. Tr. 272; Doc. 7-6, p. 11). Before the onset of his impairments, Plaintiff worked as a construction laborer. (Admin. Tr. 35; Doc. 7-2, p. 37).

On August 31, 2021, Plaintiff's application was denied at the initial level of administrative review. (Admin. Tr. 11; Doc. 7-2, p. 12). On October 27, 2021, Plaintiff's application was denied on reconsideration. *Id.* On December 2, 2021, Plaintiff requested an administrative hearing. *Id.*

On May 11, 2022, Plaintiff, assisted by an attorney, testified during a telephone hearing before Administrative Law Judge Michele Stolls (the "ALJ"). (Admin. Tr. 11, 37; Doc. 7-2, pp. 12, 38). On May 20, 2022, the ALJ issued a decision denying Plaintiff's application for benefits. (Admin. Tr. 37; Doc. 7-2, p. 38). On June 28, 2022, Plaintiff requested that the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council") review the ALJ's decision. (Admin. Tr. 233; Doc. 7-4, p. 102).

On November 4, 2022, the Appeals Council denied Plaintiff's request for review.  (Admin. Tr. 1; Doc. 7-2, p. 2).

On December 21, 2022, Plaintiff filed a complaint in the district court. (Doc. 1). In the complaint, Plaintiff alleges that the ALJ's decision denying the application is not supported by substantial evidence and is contrary to the law. (Doc. 1, ¶¶ 13, 14). As relief, Plaintiff requests relief as this Court deems just and proper. (Doc. 1, ¶ 14(d)).[2]

On February 16, 2023, the Commissioner filed an answer. (Doc. 6). In the answer, the Commissioner asserts "the decision holding that Plaintiff is not entitled

_____

[2] In paragraph 14(c) of his Complaint, Plaintiff requests supplemental security income payments. Plaintiff did not apply for supplemental security income under Title XVI. (Doc. 1, ¶ 14(c)). The present case involves an application for disability insurance benefits; therefore, we will disregard Plaintiff's request for supplemental security income payments.

to disability insurance benefits is correct and in accordance with the law and regulations," and that "the Commissioner's findings of fact are supported by substantial evidence." (Doc. 6, ¶ 7). Along with his answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 7).

Plaintiff's Brief (Doc. 10) and the Commissioner's Brief (Doc. 11) have been filed.  Plaintiff did not file a reply. This matter is now ready to decide.

## III.   LEGAL STANDARDS

Before looking at the merits of this case, it is helpful to restate the legal principles governing Social Security Appeals, including the standard for substantial evidence review, and the guidelines for the ALJ's application of the five-step sequential evaluation process. We will also summarize the administrative guidance regarding an ALJ's evaluation of primary headache disorders and medical opinion evidence.

### A. Substantial Evidence Review – the Role of This Court

A district court's review of ALJ decisions in social security cases is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.[3] Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable

---

[3] *See* 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

mind might accept as adequate to support a conclusion."[4] Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.[5] A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.[6] But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."[7] In determining if the Commissioner's decision is supported by substantial evidence under sentence four of 42 U.S.C. § 405(g), the court may consider any evidence that was in the record that was made before the ALJ.[8]

The Supreme Court has underscored the limited scope of district court review in this field, noting that:

---

[4] *Pierce v. Underwood,* 487 U.S. 552, 565 (1988).

[5] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

[6] *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

[7] *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

[8] *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001) ("when the Appeals Council has denied review the district court may affirm, modify, or reverse the Commissioner's decision, with or without a remand based on the record that was made before the ALJ (Sentence Four review)."). The claimant and Commissioner are obligated to support each contention in their arguments with specific reference to the record relied upon. L.R. 83.40.4; *United States v. Claxton*, 766 F.3d 280, 307 (3d Cir. 2014) ("parties . . . bear the responsibility to comb the record and point the Court to the facts that support their arguments."); *Ciongoli v. Comm'r of Soc. Sec.*, No. 15-7449, 2016 WL 6821082 (D.N.J. Nov. 16, 2016) (noting that it is not the Court's role to comb the record hunting for evidence that the ALJ overlooked).

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. *T-Mobile South, LLC* v. *Roswell*, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid.*; see, *e.g.*, *Perales*, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison*, 305 U.S. at 229, 59 S.Ct. 206. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).[9]

To determine whether the final decision is supported by substantial evidence, the court must decide not only whether "more than a scintilla" of evidence supports the ALJ's findings, but also whether those findings were made based on a correct application of the law.[10] In doing so, however, the court is enjoined to refrain from

---

[9] *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).

[10] *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

trying to re-weigh evidence and "must not substitute [its] own judgment for that of the fact finder."[11]

Furthermore, meaningful review cannot occur unless the final decision is adequately explained. As the Court of Appeals has noted on this score:

> In *Burnett*, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable judicial review. *Id.* at 120; *see Jones v. Barnhart*, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505.[12]

### B. STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[13] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in

---

[11] *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014).

[12] *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009).

[13] 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).

the national economy.[14] To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.[15]

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.[16] Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").[17]

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[18] In making this assessment, the ALJ considers

---

[14] 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

[15] 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

[16] 20 C.F.R. § 404.1520(a).

[17] 20 C.F.R. § 404.1520(a)(4).

[18] *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a)(1).

all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.[19]

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her from engaging in any of his or her past relevant work.[20] Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.[21]

### C. EVALUATION OF PRIMARY HEADACHE DISORDERS

"Headaches are complex neurological disorders involving recurring pain in the head, scalp or neck."[22] Headaches are classified as either primary or secondary. As explained in SSR 19-4p:

> Primary headaches occur independently and are not caused by another medical condition. Secondary headaches are symptoms of another medical condition such as a fever, infection, high blood pressure, stroke, or tumors.[23]

---

[19] 20 C.F.R. § 404.1545(a)(2).
[20] 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512; *Mason*, 994 F.2d at 1064.
[21] 20 C.F.R. § 404.1512(b)(3); *Mason*, 994 F.2d at 1064.
[22] SSR 19-4p, 2019 WL 4169635, at *3.
[23] *Id.*

The Social Security Administration treats primary headache disorders and secondary headache disorders differently. A primary headache disorder may be established as a medically determinable impairment. The Social Security Administration will not, however, consider a secondary headache disorder as a medically determinable impairment because "secondary headaches are symptoms of another underlying medical condition."[24]

Primary headache disorders include "migraines, tension-type headaches, and trigeminal autonomic cephalalgias."[25] This case involves migraine headaches. As explained in SSR 19-4p:

> Migraines are vascular headaches involving throbbing and pulsating pain caused by the activation of nerve fibers that reside within the wall of brain blood vessels traveling within the meninges (the three membranes covering the brain and spinal cord). There are two major types of migraine: Migraine with aura and migraine without aura. Migraine with aura is accompanied by visual, sensory, or other central nervous system symptoms. Migraine without aura is accompanied by nausea, vomiting, or photophobia (light sensitivity) and phonophobia (sound sensitivity). Migraine without aura is the most common form of migraine.[26]

---

[24] *Id.* at *6.

[25] *Id.* at *3.

[26]*Id.* SSR 19-4p references diagnostic criteria published in the 3rd edition of the International Classification of Headache Disorders ("ICHD-3") by the Headache Classification Committee of the International Headache Society.

Physicians diagnose primary headache disorders only after excluding alternative medical and psychiatric causes of a patient's symptoms.[27] Diagnosis is made "after reviewing a person's full medical and headache history and conducting a physical and neurological examination."[28] "To rule out other medical conditions that may result in the same or similar symptoms, a physician may also conduct laboratory tests or imaging scans. For example, physicians may use magnetic resonance imaging (MRI) to rule out other possible causes of headaches—such as a tumor—meaning that an unremarkable MRI is consistent with a primary headache disorder diagnosis."[29]

### D.    ALJ REVIEW OF MEDICAL OPINION EVIDENCE AND PRIOR ADMINISTRATIVE MEDICAL FINDINGS

When deciding whether to grant or deny an application for benefits, an ALJ is required to consider "all evidence" in the case record.[30] How that evidence is considered and the extent to which an ALJ is required to articulate that consideration is dictated by caselaw and the Commissioner's regulations. Two types of evidence that often appear in social security case records are: (1) medical opinions; and (2)

---

[27] *Id.* at *4.

[28] *Id.*

[29] *Id.*

[30] 20 C.F.R. § 404.1520(a)(3).

prior administrative medical findings.[31] The framework governing an ALJ's consideration of medical opinions and prior administrative medical findings is set forth in 20 C.F.R. § 404.1520c.

Turning to the question of *how* medical opinions and prior administrative medical findings are considered, under these regulations, an ALJ will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."[32] Instead, the persuasiveness of all medical opinions and prior administrative medical findings is evaluated based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of treatment, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship); and (4) specialization.[33] The ALJ may also consider any other factors that "tend to support or contradict" a medical opinion or prior administrative medical finding, including but not limited to: a source's familiarity with the other evidence in the claim, his or her understanding of the disability program and policies, and whether new evidence

---

[31] The Commissioner's regulations also carefully define these types of evidence. 20 C.F.R. § 404.1502(d) (defining medical source); 20 C.F.R. § 404.1513(a)(2) (defining the types of statements that are medical opinions); 20 C.F.R. § 404.1513(a)(5) (defining prior administrative medical finding).

[32] 20 C.F.R. § 404.1520c(a).

[33] 20 C.F.R. § 404.1520c(c).

received after the opinion or finding was issued makes the opinion or finding more or less persuasive.[34] Finally, when a single source provides multiple opinions or findings, those opinions or findings will be considered together.[35]

There is, however, a significant difference between what an ALJ is required to *consider* and what an ALJ is required to *articulate*.[36] The Commissioner's regulations provide that, in most cases, the ALJ is only required to articulate how two factors are considered: supportability and consistency.[37] Additional factors will only be discussed "as appropriate."[38] Finally, like the *consideration* of multiple opinions or findings by the same source, the ALJ will *articulate* how he or she evaluated them together.[39]

The sufficiency of an ALJ's articulation of how supportability and consistency were considered is a frequently litigated issue. The consideration of an

---

[34] 20 C.F.R. § 404.1520c(c).

[35] 20 C.F.R. § 404.1520c(a).

[36] *See Zaborowski v. Comm'r of Soc. Sec.*, No. 23-2637, 2024 WL 4220691 (3d Cir. Sept. 18, 2024) (observing that when evaluating "medical opinions in Social Security matters, administrative law judges must *consider* a range of factors, but all they must *explain* are the reasons for their decisions.").

[37] 20 C.F.R. § 404.1520c(b)(2).

[38] 20 C.F.R. § 404.1520c(b)(2); *see also* 20 C.F.R. § 404.1520c(b)(3) (explaining it is appropriate to explain how the other "most persuasive" factors were considered where two or more medical opinions or prior administrative medical findings about the same issue are equally well-supported and equally consistent with the case record).

[39] 20 C.F.R. § 404.1520c(b)(1).

opinion or finding's "supportability" involves a review of the objective medical evidence and supporting explanations that the source who issued that opinion or finding provides.[40] The consideration of an opinion or finding's "consistency" involves a review of evidence from *other* medical and nonmedical sources.[41] Thus, it naturally follows that the articulation of how "supportability" and "consistency" were considered requires a discussion of supporting evidence and explanations given by the source of the opinion or finding, and the evidence from other medical and nonmedical sources, coupled with an explanation of how that evidence supports or contradicts the limitations set forth in a source's opinion or finding.[42]

Although it is helpful for the purposes of judicial review, nothing in 20 C.F.R. § 404.1520c(b) requires that an ALJ use the words "supportability" or "consistency," when articulating how those factors were considered.[43] A mere summary of the source's opinion or findings or a summary of the evidence with no analysis,

---

[40] 20 C.F.R. § 404.1520c(c)(1).

[41] 20 C.F.R. § 404.1520c(c)(2).

[42] *See*, *e.g.*, *Larkin v. O'Malley*, No. CV 23-275-LDH, 2024 WL 1675678, at *5 (D. Del. Mar. 28, 2024) (observing an ALJ adequately addressed supportability by noting the absence of a supporting explanation where a physician merely checked boxes for diagnoses and symptoms).

[43] *Zaborowski*, 2024 WL 4220691, at *2 (concluding an ALJ need not "reiterate the magic words 'support' and 'consistent' for each doctor," and upholding an ALJ's decision as consistent with 20 C.F.R. § 404.1520(b)(2) where the ALJ wove "supportability and consistency throughout her analysis of which doctors were persuasive.").

however, does not satisfy an ALJ's obligation under 20 C.F.R. § 404.1520c(b).[44] A single sentence devoted to this explanation may not be enough.[45] And the explanation must be clear enough that the Court can easily discern what evidence the ALJ is discussing in that articulation.[46]

## IV.   DISCUSSION

Plaintiff raises two broad issues in his statement of errors. The first issue he raises, however, includes several sub-issues. Thus, we construe Plaintiff's brief as arguing that substantial evidence does not support the ALJ's decision because:

(1)   The ALJ did not adequately articulate why she found Dr. O'Donoghue's medical opinion unpersuasive.

(2)   The ALJ did not adequately articulate why she found Dr. Jantunen's medical opinion unpersuasive.

---

[44] *Solberg v. O'Malley*, No. CV 23-2639, 2024 WL 1943328, at *6 (E.D. Pa. Apr. 30, 2024); *Alejandro v. O'Malley*, No. 21-CV-04076-RAL, 2024 WL 1704904, at *4 (E.D. Pa. Apr. 18, 2024) (a conclusion that an opinion or finding is not persuasive unaccompanied by explanation is not sufficient); *Khal v. Kijakazi*, 2023 WL 4546497, at *8-9 (E.D. Pa. July 13, 2023) (finding that general conclusions concerning a claimant's RFC, a factual recitation of a physician's treatment records, or a summary of other evidence in the record that appears somewhere in the ALJ's decision does not meet an ALJ's obligations under 20 C.F.R. § 404.1520c(b)).

[45] *Andrews v. Kijakazi*, No. 1:20-CV-01878, 2022 WL 617118, at *7 (M.D. Pa. Mar. 2, 2022) (finding that an ALJ did not adequately articulate why he found an opinion persuasive where he provided only one sentence to address both supportability and consistency, did not cite to any exhibits, and inaccurately claimed that the source had the benefit of reviewing the entire record).

[46] *Brownsberger v. Kijakazi*, No. 3:20-CV-01426, 2022 WL 178819, at *7 (M.D. Pa. Jan 18, 2022) (remanding where an ALJ did not provide citations to specific evidence in the record, which made impossible to review).

(3)     The ALJ did not adequately articulate why she found Dr. DiDio's medical opinion unpersuasive.

(4)     The ALJ did not adequately articulate why she found Dr. Kajic's opinion only partially persuasive.

(5)     The ALJ did not properly evaluate Plaintiff's symptoms.

We will address Plaintiff's first and second arguments only. We find that these two arguments require remand, and therefore need not address his remaining arguments. We will begin our analysis with a review of the ALJ's decision denying Plaintiff's application for benefits.

### A.     THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATION

In her May 2022 decision, the ALJ found that Plaintiff met the insured status requirement of Title II of the Social Security Act through June 30, 2024. (Admin. Tr. 13; Doc. 7-2, p. 14). Then, Plaintiff's application was evaluated at steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between January 1, 2018, (Plaintiff's alleged onset date) and May 20, 2022, (the date the ALJ decision was issued) ("the relevant period"). *Id*.

At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairments: traumatic brain injury with mild neurocognitive disorder and post-concussion syndrome; bilateral tinnitus; bilateral sensorineural hearing loss; benign paroxysmal vertigo; degenerative disc

disease and degenerative joint disease of the lumbar and cervical spine with radiculopathy; chronic post-traumatic headaches/migraine headaches; sleep apnea; right wrist tenosynovitis and tendonitis; pes planus/plantar fasciitis; posttraumatic stress disorder (PTSD); major depressive disorder; and generalized anxiety disorder. (Admin. Tr. 14; Doc. 7-2, p. 15). The ALJ also identified the following medically determinable non-severe impairments: vitamin D deficiency; hyperlipidemia; kidney stones; gastroesophageal reflux disease (GERD); facial scars; eczema; limited flexion of knee; in growing nail; dystrophia of unguium (a nail condition); elevated prostate specific antigen (PSA); bilateral shoulder tendonitis; alcohol use disorder in full remission; and agoraphobia. (Admin. Tr. 14-15; Doc. 7-2, pp. 15-16).

At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 16; Doc. 7-2, p. 17).

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to engage in light work as defined in 20 C.F.R. § 404.1567(b) except:

> He is limited to occupations that require no more than occasional postural maneuvers, such as stooping, kneeling, crouching, crawling, or climbing on ramps and stairs, but he must avoid occupations that

require climbing on ladders, ropes, and scaffolds. The claimant is limited to occupations that require no more than frequent balancing. He is limited to occupations that require no more than occasional pushing or pulling with the lower extremities, to include the operation of pedals. He is limited to occupations that require no more than occasional overhead reaching or pushing and pulling with the upper extremities, to include the operation of hand levers or overhead work. The claimant must avoid concentrated prolonged exposure to fumes, odors, dusts, gases, chemical irritants, environments with poor ventilation, cold temperature extremes, or vibration. He is limited to occupations that do not require exposure to hazards, such as dangerous machinery and unprotected heights. He must avoid exposure to occupations that precent noise levels above level 3 (which is moderate). The claimant is limited to occupations that require him to understand, remember, and carry out simple instructions and make simple work-related decisions. He is limited to occupations that require him to deal with occasional changes in a routine work setting. Additionally, the claimant is limited to occupations that require no more than occasional interaction with supervisors, coworkers, and members of the general public.

(Admin. Tr. 21-22; Doc. 7-2, pp. 22-23).

At step four, the ALJ found that, during the relevant period, Plaintiff could not engage in his past relevant work. (Admin. Tr. 35; Doc. 7-2, p. 36).

At step five, the ALJ found that, considering Plaintiff's age, education and work experience, Plaintiff could engage in other work that existed in the national economy. (Admin. Tr. 35-36; Doc. 7-2, pp. 36-37). To support her conclusion, the ALJ relied on testimony given by a vocational expert during Plaintiff's administrative hearing and cited the following four representative occupations: marker, DOT # 209.587-034; cleaner, DOT # 323.687-014; garment sorter, DOT

#222.687-014; and stock checker, DOT # 299.667-014. (Admin. Tr. 36; Doc. 7-2, p. 37).

**B.     THE ALJ DID NOT ADEQUATELY ARTICULATE WHY SHE FOUND DR. O'DONOGHUE'S OPINION UNPERSUASIVE**

Plaintiff developed headaches with photophobia and occasional vomiting after concussions sustained in IED blasts. (Admin. Tr. 428; Doc. 7-7, p. 60). In 2018, Plaintiff reported 2-3 headaches per week that were responsive to naproxen (Aleve). *Id.* He was then prescribed gabapentin, which was not effective for headaches. *Id.* He also used Excedrin sparingly. *Id.*

As of July 2020, Plaintiff reported daily "pressure-like" headaches in the left or right frontal area that were sometimes triggered by sounds or smells. *Id.* He also reported back and neck pain and vertigo. *Id.* Plaintiff reported that his symptoms induced vomiting and required him to lie in a dark room approximately six times per week. *Id.* He had episodes of vertigo 3-4 times per week, which began approximately one- and one-half years ago. *Id.* He saw a physical therapist and an ear nose and throat specialist, but the vertigo did not resolve. *Id.*

On July 15, 2020, neurologist Margaret O'Donoghue, M.D., began treating Plaintiff for migraine headaches. (Doc. 10, p. 12). Their first encounter was during a forty-seven-minute telephone follow-up for Plaintiff's migraines. (Admin. Tr. 427-28; Doc. 7-7, pp. 60-61). Dr. O'Donoghue recorded the initial diagnosis of "post-

traumatic migraines, vertigo." *Id.* Dr. O'Donoghue noted after Plaintiff's first visit that the "vertigo is likely related to his TBI" but "could be migrainous." *Id.* Plaintiff was prescribed Depakote for migraine prophylaxis. *Id.*[47]

On February 24, 2021, Dr. O'Donoghue examined Plaintiff a second time. (Admin. Tr. 406-407; Doc. 7-7, pp. 39-40). Plaintiff reported that the Depakote did not reduce his headaches. He stated he had daily headaches, which were completely debilitating approximately 4 or 5 times per week for several hours. *Id.* Plaintiff was changed to a new medication—propranolol. *Id.* He was directed to follow-up in six weeks. *Id.* It is not clear whether he did.

On May 25, 2021, Dr. O'Donoghue completed a seven-page fill-in-the-blank impairment questionnaire about Plaintiff's headaches. (Admin. Tr. 950-56; Doc. 7-7, pp. 583-89). She reported that the date of first treatment was July 15, 2020, and the date of Plaintiff's most recent office visit was February 24, 2021. *Id.* She stated that the frequency of treatment was office visits every 3-6 months. *Id.* Dr. O'Donoghue assessed that Plaintiff's migraines were severe, and would frequently interfere with his ability to concentrate, make him unable to tolerate even low stress

---

[47] During the encounter, Plaintiff and Dr. O'Donoghue discussed multiple possible treatments including propranolol (which works better for "classical" migraines), Topiramate (which had some added risks because Plaintiff had a history of kidney stones), Depakote, and Botox injections. (Admin. Tr. 429; Doc. 7-7, p. 62). They decided to try Depakote first. *Id.*

during headaches, and cause Plaintiff to be absent more than three times per month. The vocational expert testified that these types of limitations would preclude the performance of all work.[48] The ALJ provided the following summary of that opinion:

> Margaret O'Donoghue, M.D., opined May 2021 that the claimant experiences frequent pain or other symptoms severe enough to interfere with attention and concentration and his symptoms will last at least 12 months [Ex. 4F/5]. Dr. O'Donoghue further opined that the claimant would be incapable of even "low stress" work stress during a headache, he would likely be absent from work as a result of his impairments more than three times a month, and during times of a headache, the claimant would be precluded from performing even basic work activities and he would need a break from the workplace [Ex. 4F/7]. She noted that he would need to avoid noise, but no other limitations were noted.

(Admin. Tr. 31; Doc. 7-2, p. 33).

After this opinion was issued, Plaintiff continued to seek care from Dr. O'Donoghue. On September 2, 2021, Dr. O'Donoghue examined Plaintiff a third time. (Admin. Tr. 2643-2645; Doc. 7-8, pp. 1194-1196). As before Plaintiff reported daily headaches that are "debilitating" four or five times per week. The propranolol was not helping his headaches. Dr. O'Donoghue increased Plaintiff's dosage. He reported that his most disabling symptom was vertigo and Dr. O'Donoghue said it

---

[48]The VE testified that: (1) all competitive work would be eliminated if a person would be off task more than 30% of the workday, (Admin. Tr. 92; Doc. 7-2, p. 93); and all competitive work would be eliminated if a person would likely be absent from work three or more times per month, (Admin. Tr. 93; Doc. 7-2, p. 94).

was "conceivable" the symptom was "migrainous," but noted the vertigo did not occur with Plaintiff's headaches. *Id.* She ordered MRIs to investigate. *Id.*

In November 2021, the MRIs of Plaintiff's lumbar spine, cervical spine, and brain that Dr. O'Donoghue ordered were taken. (Admin. Tr. 1968-1974; Doc. 7-8, pp. 519-25).

On December 23, 2021, Dr. O'Donoghue completed a second headache questionnaire and provided a narrative letter. (Admin. Tr. 2425-2430, 2432; Doc. 7-8, pp. 976-81, 983). On the questionnaire Dr. O'Donoghue reported that she last examined Plaintiff on September 2, 2021, and that she treated Plaintiff about every six months. *Id.* The ALJ wrote the following summary of those statements:

> In December 2021, Dr. O'Donoghue opined that the claimant experiences frequent pain or other symptoms severe enough to interfere with attention and concentration and his symptoms will last at least 12 months [Ex. 13F/6]. Dr. O'Donoghue further opined that the claimant would likely be absent from work as a result of his impairments more than three times a month, and during times of a headache, the claimant would be precluded from performing even basic work activities and he would need a break from the workplace [Ex. 13F/7]. Dr. O'Donoghue also indicated that the claimant's condition is chronic, which will be ongoing indefinitely, and due to his current reported frequency of migraines, he cannot work [Ex. 14F/2].

(Admin. Tr. 31; Doc. 7-2, p. 33).

Ultimately, the ALJ found that Plaintiff had a medically determinable primary headache disorder of "chronic post-traumatic headaches/migraine headaches."[49] She concluded however, that Dr. O'Donoghue's opinions about the limitations those migraines would cause were not persuasive. In support of that conclusion, the ALJ explained:

> The undersigned finds these opinions unpersuasive. Dr. O'Donoghue indicated that she had only seen the claim [sic] at three times since July 2020, with her last exam being performed in September 2021, and she noted the claimant's subjective complaints [Ex. 13F/3 and 14F/2]. She also noted that she did not know if emotional factors contributed to the severity of the claimant's symptoms and functional limitations, and she was unsure of the earliest date regarding the claimant's symptoms and limitations [Ex. 14F/5 and 3F/6, 8]. As detailed above, imaging of the claimant's brain revealed no acute intracranial pathology [Ex. 12F/31 and 15F/18]. In addition, based upon the claimant's reported activities of daily living, the record does not support Dr. O'Donoghue's opined limitations regarding low stress work nor absences. When asked by the undersigned at the hearing what prevented the claimant from working, he did not mention headaches or migraines until his counsel brought up the subject. The claimant's testimony about the nature and frequency of his headaches is not consistent with his reporting in the record and his conservative treatment.

---

[49] A secondary headache disorder would not have been acknowledged as a medically determinable impairment at step two. *See* 19-4p, 2019 WL 4169635, at *6.

*Id.* The ALJ nonetheless limited Plaintiff to work where he could avoid some of the things that trigger his "debilitating migraines," including loud noise and strong smells.[50]

Plaintiff argues that the ALJ's rationale for discounting Dr. O'Donoghue's opinions does not actually support her conclusion that the opinion is unpersuasive. We agree that several of the reasons set forth in the ALJ's articulation do not justify her conclusion. She then concludes the articulation paragraph with an unrelated determination that Plaintiff's testimony about his headaches is inconsistent with the objective record (more specifically Plaintiff's course of treatment) but does not connect this conclusion to her persuasiveness analysis.

First, Plaintiff challenges the ALJ's criticism that "imaging of the claimant's brain revealed no acute intracranial pathology" and argues that "recurrent migraine headaches cannot be documented by X-rays." (Admin. Tr. 31; Doc. 7-2, p. 33); (Doc. 10, p. 25). The Commissioner counters that SSR 19-4p provides otherwise, and in fact encourages ALJs to consider objective evidence when evaluating a primary headache disorder. (Doc. 11, p. 26).

---

[50] Plaintiff reported that he has some degree of headache daily. No "trigger" for these daily headaches has been identified. He and his doctor have been able to identify things that trigger his more severe migraines.

In a way, both parties are correct. SSR 19-4p explains that brain imaging may be used to rule out a physical abnormality that could cause migraine symptoms, and that the absence of abnormality on brain imaging may support a primary (as opposed to secondary) headache disorder diagnosis.[51] This type of objective evidence may be useful during certain aspects of an ALJ's decision-making process. Brain imaging cannot, however, actually show a migraine or its severity, and imaging is not required to make a primary headache disorder diagnosis.[52] Therefore, the brain imaging the ALJ cites is not relevant to the frequency of Plaintiff's migraines, or the severity of any limitation they cause. It is also not relevant to the determination of whether Dr. O'Donoghue's opinions about Plaintiff's limitations are persuasive. Thus, this aspect of the ALJ's rationale does not support her conclusion that Dr. O'Donoghue's opinions are unpersuasive.

Second, Plaintiff challenges the ALJ's statement that "based upon the claimant's reported activities of daily living, the record does not support Dr. O'Donoghue's opined limitations regarding low stress work nor absences." (Admin. Tr. 31; Doc. 7-2, p. 32). Plaintiff argues that "none of Plaintiff's minimal activities

---

[51] SSR 19-4p, 2019 WL 4169635, at *4.

[52] *Kulbacki v. Colvin*, No. CV 2:15-297, 2016 WL 2609984, at *8 (W.D. Pa. May 6, 2016) (observing that "Courts have consistency recognized the medical reality that brain scans and physical examinations cannot detect migraine headaches"); SSR 19-4p, 2019 WL 4169635, at *4.

contradict" this limitation. (Doc. 10, p. 27). The Commissioner argues that they do. (Doc. 11, pp. 23-24, 27). Both Plaintiff and the Commissioner cite to different aspects of Plaintiff's activities to support their arguments.[53] The ALJ's decision, even reviewed as a whole, does little to clarify matters, as the ALJ does not identify what activities of daily living are inconsistent with the low stress work and attendance limitations in Dr. O'Donoghue's opinion.

The first limitation at issue, the "low stress" limitation, appears in only one of Dr. O'Donoghue's opinions (the May 2021 Questionnaire). In that opinion, Dr. O'Donoghue states that Plaintiff is incapable of tolerating even low stress work *during a headache*. (Admin. Tr. 955; Doc. 7-7, p. 588). The second limitation, that Plaintiff would be absent three or more times per month, appears in both questionnaires. (Admin. Tr. 955, 2429; Docs. 7-7, p. 588 and 7-8, p. 980). The ALJ does not adequately articulate *how* these limitations are inconsistent with Plaintiff's daily activities, or which daily activities they are inconsistent with. Instead, the ALJ merely *concludes* the limitation is inconsistent with some unspecified daily

---

[53] Plaintiff relies on his testimony regarding his ability to drive, cook, care for his son, and maintain his own personal hygiene. (Doc. 10, p. 28). The Commissioner cites to evidence that Plaintiff traveled to Las Vegas once during the relevant period, attended the Culinary Institute for three months in 2020 (earing an A average), attended one cornhole tournament, helped care for his mother, went for walks, went grocery shopping, and *was* an avid hunter and fisherman. (Doc. 11, pp. 23-24, 27).

activities. Such conclusory statements do not satisfy an ALJ's obligation under 20 C.F.R. § 404.1520c(b)(2). Therefore, we agree that this aspect of the ALJ's articulation does not justify her persuasiveness finding.

Third, the ALJ concluded her articulation of her persuasiveness finding with two sentences analyzing Plaintiff's statements about his migraine headaches. In one of those sentences, she wrote "[t]he claimant's testimony about the nature and frequency of his headaches is not consistent with his reporting in the record and his conservative treatment." (Admin. Tr. 31; Doc. 7-2, p. 33).[54] Plaintiff asserts that the ALJ's rationale in this regard is "both bad law and bad medicine," and argues that it is not clear whether a more invasive treatment (like surgery) is even available for migraines. (Doc. 10, p. 28). The Commissioner responds to this argument in a footnote and argues that "it was reasonable for the ALJ to find about three appointments with a neurologist for medication management between 2018 and 2022 a conservative course of treatment."[55]

---

[54] The ALJ also characterizes Plaintiff's treatment for migraine headaches as "conservative." The relevant inquiry in such circumstances, however, is not whether a claimant's treatment is conservative or aggressive, it is instead whether the nature of the treatment received is consistent (or inconsistent) with the symptoms and limitations alleged. An ALJ's characterization of treatment as "conservative," without more does not adequately address this question.

[55] The Commissioner also suggests Plaintiff's headache treatment was limited to over-the-counter medication and hydration in July 2021, based on a statement recorded in an internal medicine examination conducted by a Nurse Practitioner at the Social Security Administration's request. (Admin. Tr. 1420; Doc. 7-7, p. 1053)

It is not clear to us whether the two sentences at the conclusion of the paragraph, addressing Plaintiff's statements, are part of the ALJ's articulation of how she reached her decision that Dr. O'Donoghue's opinions were unpersuasive. Reading the decision as a whole, it appears more likely that these sentences are part of the ALJ's symptom analysis. The Commissioner's regulations define "symptoms" as a *claimant's* statements about his impairments.[56] SSR 16-3p explains that where a claimant's statements about his impairments are "inconsistent with the objective medical evidence and other evidence," an ALJ will determine that they are less likely to reduce his ability to work.[57] The consideration of a claimant's attempts

---

("He takes over-the-counter Motrin and hydrates."). The same assessment, however, documents that Plaintiff takes Propranolol daily—the medication his neurologist prescribed as a migraine prophylactic. Moreover, the only records available to this source prior to her assessment was an acupuncture record from March 2021. (Admin. Tr. 1422; Doc. 7-7, p. 1055).

[56] 20 C.F.R. § 404.1502 (defining symptoms as a claimant's own description of their physical or mental impairment).

[57] *See* SSR 16-3p, 2017 WL 5180304, at *8-9. The ALJ did discuss Plaintiff's treatment and, speaking generally as to all of Plaintiff's impairments, found that "the claimant's statements about the intensity, persistence, and limiting effects of his symptoms," were "inconsistent because records show generally mild to moderate findings on objective imaging and physical exams," and "show the claimant was prescribed medication for treatment of his impairments and he required no surgical interventions nor assistive devices." (Admin. Tr. 24; Doc. 7-2, p. 25). The ALJ also noted that Plaintiff was not entirely compliant with his treatment for vertigo (the physical and vestibular therapy). *Id.* The ALJ then summarized records that suggest Plaintiff saw specialists to address his vertigo and migraine symptoms, has no significant hearing or speech limitations, no physical brain abnormality, and that he changed medications because the initial prophylactic migraine medication prescribed (Depakote) did not improve his migraine or vertigo symptoms. *Id.*; *see*

Page 28 of 37

to seek and follow medical treatment, as well as the frequency and extent of the treatment sought, is relevant to this determination.[58]

It would certainly be appropriate to find a physician's opinion less persuasive where it is based primarily on symptoms that are inconsistent with the record.[59] It is not clear, however, that this is what the ALJ intended by including these sentences at the conclusion of her articulation of the persuasiveness of Dr. O'Donoghue's opinions. Courts have repeatedly held that, when applying our deferential standard of review, an "'ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision.'"[60] Neither the Commissioner nor the Court may offer a post-hoc

---

*also* SSR 16-3p, 2017 WL 518034, at *9 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."). The ALJ did not reach any conclusion at the end of her summary of the migraine/vertigo treatment records. The two sentences at the end of the Dr. O'Donoghue paragraph appear to reconcile Plaintiff's symptoms with the summary of records.

[58] *Id.*

[59] *See Morris v. Barnhart*, 78 F. App'x 820, 824 (3d Cir. 2003) (affirming an ALJ's decision to discredit a physician's opinion on disability that was premised on a claimant's properly discounted subjective complaints).

[60] *Schuster v. Astrue*, 879 F.Supp.2d 461 (E.D. Pa. July 10, 2012); *Khal*, 2023 WL 4546497, at *10 ("the ALJ never indicated that she discounted Dr. Yacoub's opinion based on this evidence, which makes the Acting Commissioner's assertions no more than post-hoc rationalizations."); *Nichols v. Colvin*, No. 14-01755, 2015 WL 5255245, at *4 (W.D. Pa. Sept. 9, 2015) ("Although there may be grounds in the record to support the ALJ's conclusion, it is not [the Court's] role to seek out such grounds and justify the ALJ's decision post-hoc. Although this approach may appear to elevate form over substance, the requirement that an ALJ adequately

rationalization to support an ALJ's conclusion. Thus, we similarly find that these two sentences do not justify the ALJ's conclusion that Dr. O'Donoghue's opinions are unpersuasive.

Therefore, we find that portions of the ALJ's articulation of why she found Dr. O'Donoghue's opinions unpersuasive are not supported by the record. Other portions of her articulation are incomplete, as they lack meaningful analysis.

### C. THE ALJ DID NOT ADEQUATELY ARTICULATE WHY SHE FOUND DR. JANTUNEN'S OPINION UNPERSUASIVE

On April 28, 2022, neuropsychologist Silvi P. Jantunen, Psy.D. examined Plaintiff at his lawyer's request. (Admin. Tr. 2660-68; Doc. 7-8, pp. 1211-20). Following the examination, she drafted an examination report, and submitted it with an accompanying psychiatric/psychological impairment questionnaire outlining her assessment of Plaintiff's limitations. (Admin. Tr. 2664-2668; Doc. 7-8, pp. 1215-1219). In the questionnaire, she reported that Plaintiff was diagnosed with the following conditions: Posttraumatic Stress Disorder, Depressive Disorder NOS (per history), Generalized Anxiety Disorder NOS with agoraphobia (per history), Mild

---

explain his decision is not a technicality. Substantial evidence review must be based on the grounds invoked by the ALJ. Moreover, a claimant is entitled to understand the disposition of his case, especially if his treating provider has stated that he is disabled, and he 'might be especially bewildered when told by an administrative bureaucracy that [he] is not.'").

Neurocognitive Disorder due to TBI (per history), and Alcohol Use Disorder (per history – in full remission). *Id.*

In the questionnaire, Dr. Jantunen was asked to estimate Plaintiff's ability to perform certain tasks in a competitive environment on a sustained and ongoing basis (8 hours per day, 5 days per week) based on the following scale: none (symptoms do not interfere with ability); mild (symptoms rarely interfere with ability); moderate (symptoms occasionally interfere with ability, up to 1/3 of an 8-hour workday); moderate-to-marked (symptoms frequently interfere with ability, between 1/3 and 2/3 of an 8-hour workday); and marked (symptoms constantly interfere with ability, more than 2/3 of an 8-hour workday).

Dr. Jantunen identified marked limitations in the following thirteen activities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule and consistently be punctual; sustain an ordinary routine without supervision; work in coordination with or near others without being distracted by them; complete a workday without psychological symptoms; perform at a consistent pace without rest periods of unreasonable length and frequency; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to workplace changes; travel to unfamiliar places or use public transportation; set realistic goals; and make plans independently. *Id.*

Dr. Jantunen identified moderate-to-marked limitations in the following three areas: interacting appropriately with the public; maintaining socially appropriate behavior; and being aware of hazards and taking appropriate precautions. *Id.*

She also assessed that Plaintiff would likely be absent from work because of his impairments more than three times per month. *Id.*

The ALJ found that Dr. Jantunen's opinion was not persuasive. To support this finding, the ALJ explained:

> Dr. Jantunen's opinion is not consistent with nor supported by the evidence of record. Furthermore, Dr. Jantunen does not indicate a need for more intensive treatment, such as partial hospitalization or inpatient care, which would presumably be expected with such severe limitations. Furthermore, Dr. Jantunen's opinion is based on a number of diagnoses based upon history, which was self-reported by the claimant, and she only examined the claimant once.

(Admin. Tr. 33; Doc. 7-2, p. 34). The ALJ did incorporate some mental health-related limitations in the RFC, including limitations to occupations requiring only simple tasks and simple work-related decisions, only occasional changes and no more than occasional social interaction (with supervisors, coworkers, and members of the general public).

Plaintiff argues that the ALJ inadequately articulated how her consideration the supportability and consistency factors led to the conclusion that Dr. Jantunen's opinion was unpersuasive. We agree.

Plaintiff alleges that the ALJ's articulation is "so vague as to be meaningless" and that it does not meet her obligations under 20 C.F.R. § 404.1520c. (Doc. 10, p. 29). The Commissioner disagrees.

First, he argues that the ALJ did not discuss whether the opinions in the questionnaire were supported by the accompanying examination report. (Doc. 10, pp. 30-31). In response, the Commissioner refers to the ALJ summary of Plaintiff's mental health treatment and argues that the ALJ explained this opinion was based on a one-time examination and relied heavily on Plaintiff's self-reported symptoms. (Doc. 11, pp. 29-30).[61]

We agree that the ALJ did not adequately explain why Dr. Jantunen's opinion was less persuasive due to a lack of supportability. Although the ALJ did cite to that report in her summary, in her articulation of the opinion's persuasiveness she characterized the statements it contained as "opinions," rather than objective evidence or clinical observations, or mental status examination. (Admin. Tr. 32-33; Doc. 7-2, pp. 33-34). Thus, there is no explanation as to how the ALJ viewed these

---

[61] The Commissioner's argument is not persuasive. First, the ALJ did not write that Dr. Jantunen's opinion was based on self-reported *symptoms*. Instead, she suggests it was based on self-reported *diagnoses*. As we observed with Dr. O'Donoghue, it would be appropriate for an ALJ to find an opinion unpersuasive if it was based on symptoms that an ALJ properly discounts. That is not, however, the basis for the ALJ's persuasiveness finding in this case.

clinical observations, and whether those observations made the opinion more or less persuasive.

Instead, the ALJ merely suggests Dr. Jantunen's opinion is less persuasive due to a lack of supportability for two reasons: (1) her diagnoses were not well-supported because they were "by report;" and (2) Dr. Jantunen did "not indicate a need for more intensive treatment, such as partial hospitalization or inpatient care, which would presumably be expected with such severe limitations." (Admin. Tr. 33; Doc. 7-2, p. 34). Neither of these reasons justify her conclusion.

Although it would certainly be appropriate for an ALJ to find an opinion less persuasive to the extent it contains limitations accounting for impairments that are not medically determinable, that is not the case here. The ALJ found that each diagnosis listed in Dr. Jantunen's opinion was medically determinable. Plaintiff's impairments of Posttraumatic Stress Disorder, Depressive Disorder, Generalized Anxiety Disorder, and Mild Neurocognitive Disorder due to TBI were found medically determinable and severe at step two. His agoraphobia and alcohol use disorder were deemed medically determinable but non-severe at step two.

Regarding her determination that the opinion was less persuasive because Dr. Jantunen did not "indicate a need for more intensive treatment, such as partial hospitalization or inpatient care, which would presumably be expected with such severe limitations," this rationale is not adequately explained to justify the ALJ's

conclusion. First, Dr. Jantunen evaluated Plaintiff "to determine whether he is eligible for social security benefits" not to treat him. (Admin. Tr. 2660; Doc. 7-8, p. 1211). Her opinion does not contain any treatment recommendation, nor do the regulations require one for the opinion to be supported. Second, the ALJ does not identify what limitation in Dr. Jantunen's opinion would "presumably be expected" to require partial hospitalization or inpatient care, or why. Furthermore, the ALJ's musings about the types of treatment one would expect to find for a person whose work capacity was as restricted as Dr. Jantunen found should be disregarded. This type of assessment is a medical judgment and cannot be properly made by a layperson like an ALJ.[62] Thus, to the limited extent the ALJ addressed supportability, her analysis does not justify her persuasiveness finding.

Second, Plaintiff argues that the ALJ did not adequately articulate why she determined Dr. Jantunen's opinions were inconsistent with the evidence provided by other medical and nonmedical sources. (Doc. 10, pp. 32-33). We agree. The ALJ's articulation devotes no attention to whether Dr. Jantunen's opinion was consistent

---

[62] *Ralph v. Colvin*, No. 1:14-CV-01230, 2015 WL 2213576, at *15 (M.D. Pa. May 11, 2015) (quoting *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); *Wiggins v. Colvin*, No. 3:13CV118 (MPS), 2015 WL 5050144, at *3 (D. Conn. Aug. 25, 2015) (characterizing a similar statement as an improper medical judgment by an ALJ).

with evidence from other sources in the record. Thus, the ALJ did not meet her obligation under 20 C.F.R. § 404.1520c(b)(2).

Therefore, we find that the supportability portion of the ALJ's articulation of why she found Dr. O'Donoghue's opinions unpersuasive is not supported by the record. The credibility portion of the ALJ's articulation of why she found Dr. O'Donoghue's opinions unpersuasive is not complete.

### D.    THESE ERRORS REQUIRE REMAND

The O'Donoghue and Jantunen opinions include limitations that were not accounted for in the ALJ's RFC. The ALJ's failure to adequately articulate how she considered the consistency and supportability of these opinions calls her consideration of them into question. Affording full consideration to these opinions, and the more restrictive limitations they contain, could result in a different outcome here.[63] Therefore, this error is not harmless, and remand is appropriate.

### E.    PLAINTIFF'S OTHER ARGUMENTS

Plaintiff also argues that the ALJ did not adequately articulate her analysis of Dr. DiDio's opinion, did not adequately articulate her analysis of Dr. Kajic's opinion, and did not properly evaluate Plaintiff's symptoms. Because we found a

---

[63] We take no position on whether the ALJ should have found these opinions persuasive, or more broadly whether the ALJ should have granted Plaintiff's applications for benefits.

basis for remand, we need not address these issues. To the extent any further error

exists, it may be raised and reviewed on remand.

## V.     CONCLUSION

Accordingly, we conclude that Plaintiff's request for further administrative

review of his application will be GRANTED as follows:

(1)     This case will be REMANDED to the Commissioner for further
proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

(2)     Final judgment will be issued in Plaintiff's favor by separate order.

(3)     Appropriate Orders will be issued.

Date: September 30, 2024                    BY THE COURT

                                            _s/William I. Arbuckle_
                                            William I. Arbuckle
                                            U.S. Magistrate Judge